## Case No. 17,696.

·The WILLIAM H. NORTHROP.

[Blatchf. Pr. Cas. 235.] [1]

District Court, S. D. New York. Oct., 1862.

ENEMY VESSEL — FICTITIOUS SALE TO NEUTRAL — CONDEMNATION OF VESSEL—VIOLA- TION OF BLOCKADE.

1. The alleged sale of an enemy vessel, in time of war, by an enemy resident in the enemy country, to a neutral, held not to be proved.

2. The object of the transaction was to have the neutral put the vessel in trade with an enemy port. in evasion of an existing blockade of that port.

---

1 [Reported by Samuel Blatchford, Esq.]

3. A settled course of trade in violating the blockade, and the employment of the vessel before in such trade, and the fact that her claimant had before been engaged in such trade, taken into consideration in deciding this case.

4. Vessel condemned as enemy property.

5. Vessel and cargo condemned for an attempt to violate the blockade.

BETTS, District Judge. This vessel and her cargo were libelled in this suit January 17, 1862. Both were captured as prize December 25, 1861, at sea. within soundings, sixty or seventy miles off Wilmington, North Carolina, by the United States ship-of-war Fernandina, and were sent to this port for adjudication. and here attached by process of law, returnable and returned in court, duly served, February 4, 1862. Mr. Archibald, the British consul, intervened in the cause, and filed a claim to the vessel and cargo, as the property of British subjects. February 18, 1862, and the cause was brought to hearing on that issue at the present term. The documentary proof of ownership of the vessel consists in the certificate of her registry at Nassau, N. P.,· August 12, 1861, to Joseph Roberts, of that place. That document states that she was built at Wilmington. North Carolina, in the year 1859. The only written evidences of the employment or destination of the vessel subsequently to that registry are shipping articles executed at Wilmington. North Carolina, between Silliman, master of the vessel, and her crew, for a voyage from Wilmington to one or more ports in the West Indies, for a time not exceeding two months, and back to the port of Wilmington, North Carolina, which agreement was signed by the master and four seamen, at Wilmington, September 18 and 19, 1861, and by two other seamen, at the same place, one on the 27th of September, and the other on the 31st of October thereafter; a manifest of the cargo of the vessel. dated August 12, 1861. stating that it was taken on board at the Bahamas and bound for ———, under the description of the cargo, on the face of which manifest, signed by Silliman. it is noted in pencil, "Went to Wilmington"; the manifest of the master. dated at Eleuthera, Bahamas, August 24, 1861. stating that the cargo was shipped by Silliman. the spaces on the face of which manifest, marked "To whom consigned," "Place of consignee's residence," "Ports of destination," left to be filled, all remain in blank, and on the face of it, under the description of the cargo. is entered a note, in broad pencil-mark, "Went to Wilmington"; and a memorandum in writing. not dated or signed, as · follows: "Mem. sch. Wm. H. Northrop, of Nassau. N. P. Sailed from Currant Cut on the 26th of August. 1861; arrived on the coast of North Carolina on the 31st; saw one large steamship; was not boarded between the edge of the Gulf Stream and Frying Pan shoal; on the first day of September arrived at New Inlet: saw no armed vessel of any description, therefore went in,

and arrived same day at Wilmington, N. C." There is also connected with these papers a certificate of the British vice-consul, dated at Wilmington, North Carolina, September 19, 1861, authorizing the departure of the vessel from that port on a voyage to the port of Cardenas, Cuba, and asserting that at the date of the arrival of the vessel the port of Wilmington was not blockaded, except by proclamation, by any force of the United States. These are all the papers produced from the ship relating to her voyage after her sale in Nassau, except some accounts current with her and for disbursements for her use in Havana, the last of November, 1861, and a certificate or registry of like date, from the Spanish authorities, of the departure of the vessel, destined, under Captain Silliman, to the port of New York. No log-book was produced from the vessel evidencing her employment and course of trade and navigation subsequent to the alleged sale of her to the British owner, nor any bill of sale of such transfer, or proof of the actual payment of any consideration on such sale. Berkheimer, the American owner of the vessel in 1859, appointed Joseph A. Silliman to be her master before her sale at Wilmington, and he was again appointed her master at Nassau by Roberts, the purchaser on the sale there, and again in August, 1861. The vessel, in September, 1861, went from Nassau to Wilmington with a cargo of salt, coffee, and fruit. She took thence a cargo of rice and lumber to Havana, in November, 1861, and sailed thence with a cargo of coffee, medicines, and acids, for New York, and was captured on that voyage about eighty miles (within soundings) east of Wilmington and off Cape Fear. The cargo was at the time of capture owned jointly by the master and Roberts, the owner of the vessel. The master says that he had heard at Nassau as early as July from general conversation and the newspapers, of the war and the blockade of North Carolina, but "did not know positively that the coast was blockaded, but presumed it was." The mate testifies that the master told him the vessel was bound from Havana to New York, but he had a strong impression she was bound to some Southern port: that he thought so because she was so near in shore; and that he and his master knew of the war, and that the whole Southern coast was blockaded by the United States government. A seaman who was examined says that all on board knew of the war and of the blockade of North Carolina.

The intervention of the British consul in the cause is official only. He does not supply any proof, by what is called his test affidavit, of the legal ownership of Roberts, the alleged purchaser of the vessel, and none has been furnished by the latter or by any agent of his up to this period. The master, Silliman, gives the only evidence offered on that point. He says that Roberts was owner of the vessel, and that he and the witness were joint owners of the cargo captured; that he (the witness) knew from the registry and from conversation with Roberts that the latter was owner of the vessel, and that he (the witness) saw a bill of sale of the vessel some time in August, 1861, at the counting-house of Messrs. Sawyer & Menendez, of Nassau, acting as agents of Henry Berkheimer, of Wilmington, to Mr. Roberts, of Nassau, and has not seen it since. He says that he was not present when it was made; that he supposes it is now in the custom-house at Nassau; and that he knows of no other engagement concerning the purchase than what appears on the bill of sale. This is a very faint and imperfect support of a paper title to a vessel, made in time of war, by an enemy resident in an enemy country, evidently for the purpose of putting her in trade with an enemy port by a neutral, in evasion of an existing blockade of that port. In the case of The Bernon, 1 C. Rob. Adm. 102, an enemy vessel was sold and conveyed to a neutral in time of war, and Sir William Scott says, that although such purchases have been allowed to be legal, they are obnoxious to much suspicion, and the court will look into them with great jealousy, even in purchases made for neutrals resident in their own country. The caution embodied in that doctrine is significantly evoked by the incidents intermingled with the present case. And, in respect to a formal bill of sale from the vendor of the vessel, and a note for the payment of the consideration price, with a receipt for its payment, the learned judge held that evidence to be of itself inadequate to establish a lawful purchase, without proof that the purchaser had funds to satisfy the credit, or at least without further verification, by the attesting witnesses, than their mere signatures to the bill of sale, that the transaction was actually fair.

The testimony of Silliman, the master, stands before the court subject to great distrust. He represented to Tibley, the acting mate of the vessel, and to Herring, a seaman on board of the vessel, and during her last voyage, that he hailed from Bordeaux, and was a native of France, while he testifies, on his own examination, that he was born in Philadelphia, and has always lived there, and that he is married, and that his wife lives in that city. The protest which he says he made to the British vice-consul, on entering the port of Wilmington to obtain a certificate of clearance, in September, 1861, appears to flatly contradict a written memorandum of the occurrences on that voyage and of the entry into port, found on the vessel. There is, moreover, in these proofs, a very significant admonition that such consular certificates are entitled to slight consideration, when they are grounded upon dubious representations of that character. No manifest, clearance, or bill of lading, executed at Havana, are produced from the vessel. Two or three invoices of goods, dated November 30, at Havana,

without any consignment or direction to any person, are delivered to the court, with a registry from the Spanish officers of the customs, certifying that the goods had been embarked in the schooner W. H. Northrop, under Captain Silliman, destined to New York. This is doubtless intended to be an official authentication of the despatch of the vessel and cargo from the port of Havana, but fails to identify the same with reasonable certainty. Silliman, the master of the prize, testifies that Cabergoss & Co., of Havana, laded the cargo on board the schooner; that no consignees thereof were appointed; that that was left to him, Silliman, to determine on his arrival at New York; that no bills of lading were signed for the cargo; that the only paper relating to it was the invoice of the laders; and that the whole of it belonged to the witness and Roberts. The master says that the last voyage of the vessel began at Nassau, and that she was to touch at Wilmington and Havana, and end the voyage at Nassau. New York is not named by him as contemplated in the programme of the voyage, nor is that port alluded to in the shipping articles signed at Wilmington after the arrival of the vessel at that port from Nassau, in September, 1861. The master specifies the employments of the vessel under his command, backward and forward, between Wilmington and Nassau, previous to April, 1861, and between those ports since that period, up to the present voyage. The regular course of her navigation and business seems to have corresponded with that notoriously followed at Nassau since the blockade of the rebel ports, and which the records of this court show to have been also promoted and participated in by Roberts, in like manner as in the present case, and to have become the steady habit of passing in and out of Wilmington, under circumstances manifesting a full notice of the existing state of war with the United States, and of the condition of blockade of Wilmington and the other ports of the rebellious states. This case is thus brought clearly within the rules declared by Sir William Scott in The Rosalie and Betty, 2 C. Rob. Adm. 343, and since recognized and enforced in this court (The Mersey), which import a purpose in those concerned in that line of trade to violate the rights secured to the United States by the law of nations. It is thus made apparent that the vessel left Wilmington the property of a resident at that port, and in evasion of the blockade, and that this fact was well known to Roberts, in Nassau, at the time of the alleged purchase by him at that port. He gives no legal proof that a bona fide and legal transfer has since been made of her to him, a neutral, and in a neutral port. It is also manifest that the vessel ran into Wilmington from Nassau in September, 1861, knowingly in violation of the blockade of Wilmington, and there fitted out and sailed thence in the same month, destined to ports in the West Indies, and back again to Wilmington, in

violation of the blockade. It is also shown, by strong presumption, that the vessel departed in November thereafter from Havana, in the West Indies, in fulfilment of her said shipping articles, and with intent to enter the port of Wilmington, or some other blockaded port of the Southern states, and that when she was captured she was pursuing that intention, and attempting to enter a blockaded port. It must be inferred from the proofs that the scheme of the voyage contemplated a trading enterprise between Nassau and Wilmington, as the commencing and terminating points of the adventure, though other than enemy ports might, in the progress of the voyage, be visited for the purpose of obtaining cargoes or supplies. And it is clear, upon the proofs, that when captured the vessel was in execution of the purpose and attempt to violate the blockade. A decree of condemnation is, accordingly, ordered against both vessel and cargo.